1

2

3

4

5

6

7

8           IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DONALD DALE ZAMORA,

11              Petitioner,              No. 2:12-cv-1922 WBS DAD P

12        vs.

13   TIM VIRGA,

14              Respondent.          FINDINGS & RECOMMENDATIONS

15   _____/

16              Petitioner is a state prisoner proceeding through counsel with a petition for a writ

17   of habeas corpus pursuant to 28 U.S.C. § 2254.  Therein, petitioner challenges a judgment of

18   conviction entered against him in 2010 in the Shasta County Superior Court on charges of:

19   attempted kidnapping for the purpose of committing lewd and lascivious acts with a child;

20   attempted kidnapping of a child under the age of 14 years; misdemeanor making criminal threats;

21   misdemeanor indecent exposure; and misdemeanor annoying or molesting children.  He seeks

22   federal habeas relief on the following grounds:  (1) the trial court violated his Sixth Amendment

23   rights when it denied his request to represent himself at trial; (2) the trial court violated his

24   Fourteenth Amendment right to due process by shackling him during his trial when less obtrusive

25   means were available; and (3) his trial counsel rendered ineffective assistance in failing to

26   sufficiently impeach a prosecution witness.  Upon careful consideration of the record and the

1

applicable law, the undersigned will recommend that petitioner's application for habeas corpus

relief be denied.

BACKGROUND

In its unpublished memorandum and opinion affirming petitioner's judgment of

conviction on appeal[1], the California Court of Appeal for the Third Appellate District provided

the following factual summary:

> On August 25, 2009, 15-year-old D.R. was walking with his
> three-year-old sister J.R. in their apartment complex. D.R. saw
> defendant at the top of some stairs and saw his friend Kyler on the
> walkway in front of the apartments. D.R. had never seen defendant
> before.
>
> As D.R. and J.R. went up the stairs to see Kyler, defendant blocked
> their way, yelling, "Do you want to get your ass whooped, little
> boy." D.R. was frightened, and turned and walked down the stairs
> with J.R. Defendant yelled after J.R., "Hey, pretty little girl. How
> old are you? What's your name?" D.R. looked back up at
> defendant and saw that his penis was exposed.
>
> D.R. and J.R. walked across the parking lot to Kyler's apartment to
> tell Kyler's father about what happened, but he was not home.
> Then they walked back through the carport in the middle of the
> U-shaped complex to go to their apartment to tell their own
> parents. Defendant was sitting in a truck with the door open. He
> got out at some point and the next thing D.R. knew, defendant
> grabbed J.R. away from him. Defendant dragged J.R. toward his
> truck parked a few feet away. He got her into the truck and tried to
> shut the door, but D.R. hit defendant until he let J.R. go.
>
> J.R. ran home crying and told her mother that D.R. was fighting a
> man. The man had grabbed J.R. and pushed her face down into his
> privates. J.R. was hysterical and clung to her mother. A group of
> people from the apartment complex held defendant in his truck
> until the police came. While defendant sat in the truck, his pants
> were undone and his penis was exposed.
>
> Defendant denied seeing D.R. and J.R. on the stairs, denied
> speaking to J.R., denied exposing himself, and denied grabbing
> J.R. and attempting to molest her. Defendant stated, "[T]here is no
> way that I would molest a child. I grew up in a wealthy family.
> We had 54 babies." Defendant maintained that when he rented the
> apartment the day before the incident, D.R. tried to get him to buy

---

[1] ECF No. 12, at 29-50 (hereinafter Opinion).

drugs for D.R. and tried to charge him $10 to see the apartment. That same night, defendant had to go to the hospital due to severe constipation.  Two nurses became angry when he passed gas in front of them and they called the police.  The police abused him and then dropped him off in a vacant lot.

While walking home, defendant soiled his pants.  He washed them out in his apartment but had nothing to wear.  He stuck his head out the window and asked if anyone had clothes for him.  A black woman gave him some unisex pants.  Defendant testified, "[T]hat got me dressed to go – and to go make this deal that I had on a million dollar project.  I'm not kidding."

Defendant was working on his truck when he was surrounded by a crowd of people.  Someone thought he had harmed the three-year-old girl.  He was not scared because he had worked at three prisons with hardcore inmates, and had been to 28 countries on four continents over a two-year period.

Corporal Eric Niver of the Redding Police Department responded to the scene.  Defendant's zipper was undone and he had on female underwear.  Niver testified that defendant said the underwear belonged to his girlfriend, but defendant yelled out in court that this was a lie.  Niver stated that defendant admitted speaking to the three-year-old girl and telling her she was pretty.  Defendant did not tell Niver about going to the hospital, being beaten by police in a vacant lot, soiling his clothes, and getting clothes from a black woman.  Defendant did not tell Niver about D.R.'s alleged attempt to get defendant to buy drugs for him or charging him $10 to see the apartment.  Defendant told Niver he did not know the girl or her brother.

A jury convicted defendant of attempted kidnapping of a child under the age of 14 (Pen. Code, §§ 208, subd. (b), 664);[2] attempted kidnapping of a child for the purpose of committing a lewd and lascivious act (§§ 209, subd. (b), 288, 664); making criminal threats (§ 422); indecent exposure (§ 314, subd. 1); and annoying or molesting a child (§ 647.6, subd. (a)).  The jury also found that defendant had served a prior prison term (§ 667.5, subd. (b)); had been convicted previously of a serious felony (§ 667, subd. (a)(1)); and had been convicted of a serious felony within the meaning of

/////

/////

/////

---

[2]  Undesignated statutory references are to the Penal Code.

3

1    section 1170.12.  The trial court sentenced defendant to 24 years in
2    state prison.[3]

3  (Opinion at 29-33.)

4                                  ANALYSIS

5  I.  Standards of Review Applicable to Habeas Corpus Claims

6              An application for a writ of habeas corpus by a person in custody under a

7  judgment of a state court can be granted only for violations of the Constitution or laws of the

8  United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the

9  interpretation or application of state law.  See Wilson v. Corcoran, 562 U.S.___, ___, 131 S. Ct.

10  13, 16 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146,

11  1149 (9th Cir. 2000).

12             Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal

13  habeas corpus relief:

14             An application for a writ of habeas corpus on behalf of a
       person in custody pursuant to the judgment of a State court shall
15     not be granted with respect to any claim that was adjudicated on
       the merits in State court proceedings unless the adjudication of the
16     claim -

17             (1) resulted in a decision that was contrary to, or involved
       an unreasonable application of, clearly established Federal law, as
18     determined by the Supreme Court of the United States; or

19             (2) resulted in a decision that was based on an unreasonable
       determination of the facts in light of the evidence presented in the
20     State court proceeding.

21             For purposes of applying § 2254(d)(1), "clearly established federal law" consists

22  of holdings of the United States Supreme Court at the time of the state court decision.  Stanley v.

23  Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06

24  ─────────────────
25        [3]  Defendant is not entitled to an increase in presentence conduct credit because he was
      convicted of serious felonies. (§§ 208, 209, 422, 664, 1192.7, subd. (c)(20),(38), (39), 4019 [as
26    amended by Stats.2009, 3d Ex. Sess.2009–2010, ch. 28, § 50], former 2933, subd. (e)(3) [as
      amended by Stats.2010, ch. 426, § 1, eff. Sept. 28, 2010].)

                                        4

(2000)).  Nonetheless, "circuit court precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably."  Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640 (2003).  Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[4] Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Williams, 529 U.S. at 412.  See also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'").  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Harrington v. Richter, 562 U.S.___,___,131 S. Ct. 770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was /////

---

[4]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding."  Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

1  an error well understood and comprehended in existing law beyond any possibility for fairminded

2  disagreement." Richter,131 S. Ct. at 786-87.

3  　　　　　If the state court's decision does not meet the criteria set forth in § 2254(d), a

4  reviewing court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v.

5  Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th

6  Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because

7  of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

8  considering de novo the constitutional issues raised.").

9  　　　　　The court looks to the last reasoned state court decision as the basis for the state

10  court judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir.

11  2004).  If the last reasoned state court decision adopts or substantially incorporates the reasoning

12  from a previous state court decision, this court may consider both decisions to ascertain the

13  reasoning of the last decision.  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en

14  banc).  "When a federal claim has been presented to a state court and the state court has denied

15  relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

16  of any indication or state-law procedural principles to the contrary."  Richter, 131 S. Ct. at 784-

17  85.  This presumption may be overcome by a showing "there is reason to think some other

18  explanation for the state court's decision is more likely."  Id. at 785 (citing Ylst v. Nunnemaker,

19  501 U.S. 797, 803 (1991)).  Similarly, when a state court decision on a petitioner's claims rejects

20  some claims but does not expressly address a federal claim, a federal habeas court must presume,

21  subject to rebuttal, that the federal claim was adjudicated on the merits.  Johnson v. Williams,

22  ___ U.S. ___, ___, 133 S. Ct. 1088, 1091 (2013).

23  　　　　　Where the state court reaches a decision on the merits but provides no reasoning

24  to support its conclusion, a federal habeas court independently reviews the record to determine

25  whether habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860; Himes v.

26  Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is not de novo

1  review of the constitutional issue, but rather, the only method by which we can determine

2  whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853.

3  Where no reasoned decision is available, the habeas petitioner still has the burden of "showing

4  there was no reasonable basis for the state court to deny relief." Richter, 131 S. Ct. at 784.

5  　　　　　When it is clear, however, that a state court has not reached the merits of a

6  petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a

7  federal habeas court must review the claim de novo. Stanley, 633 F.3d at 860; Reynoso v.

8  Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir.

9  2003).

10  II.  Petitioner's Claims

11  　　　　A.  Denial of Request for Self-Representation

12  　　　　　Petitioner claims that the trial court violated his rights under the Sixth

13  Amendment when it denied his Faretta motion in which he sought to represent himself at trial.

14  (ECF No. 1 (hereinafter Pet.) at 18.  He argues that because his Faretta motion was timely and

15  unequivocal, it should have been granted.  (Id.)  Petitioner also argues that the trial court violated

16  his constitutional rights when it removed him from the courtroom before questioning him to

17  determine whether his Faretta request was knowing and intelligent, and then denied the request in

18  his absence.  (Id. at 18-19.)  Petitioner argues, "just as presuming waiver of the right to counsel

19  from a silent record is impossible, denying [petitioner] the right to represent himself from a silent

20  record is similarly impossible."  (Id. at 19.)

21  　　　　　Petitioner denies that his courtroom misbehavior was serious or obstructionist or

22  that it would have been impossible to carry on his trial if his Faretta motion had been granted.

23  (Id. at 20.)  Petitioner agrees that he has "a difficult time staying on-topic," but he argues that his

24  behavior was not so disruptive as to justify the denial of his Faretta motion.  (Id. at 21.)  He states

25  that most of his improper remarks came in response to direct questions posed by the trial judge

26  and that he interrupted the judge only once.  (Id.)  He argues, "this single interruption cannot

7

1  justify denying [his] right to represent himself because it does not rise to the level of 'serious and

2  obstructionist misconduct.'" (Id.)  Petitioner also notes that the judge who denied his Faretta

3  motion, had only seen petitioner on that day and at the arraignment three months earlier.  He

4  argues that under these circumstances it was improper for the judge to deny his Faretta motion

5  based "solely on his interaction with [petitioner] that spans a single page in the transcript."  (Id.)

6            Finally, petitioner argues that the trial judge should have granted the Faretta

7  motion and appointed his trial counsel as standby counsel in order "to handle the potential for

8  disruption."  (Id.)  Petitioner notes that his trial counsel had been representing him for almost

9  four months, and he argues that counsel could easily have continued on as standby counsel.  (Id.)

10           On appeal, the California Court of Appeal rejected petitioner's arguments in this

11  regard, reasoning as follows:

12  A.  Self-Representation

13         Defendant contends the trial court erred in denying his request to
       represent himself pursuant to Faretta v. California (1975) 422 U.S.

14     806, 819 [45 L.Ed.2d 562] (Faretta).

15         In Faretta, the United States Supreme Court declared that a
       defendant "must be free personally to decide whether in his

16     particular case counsel is to his advantage," even though "he may
       conduct his own defense ultimately to his own detriment. . . ."

17     (Faretta, supra, 422 U.S. at p. 834 [45 L.Ed.2d at p 581].)  Thus, a
       state may not "constitutionally hale a person into its criminal courts

18     and there force a lawyer upon him, even when he insists that he
       wants to conduct his own defense."  (Id. at p. 807 [45 L.Ed.2d at p.

19     566].)  "The right to self-representation is unconditional when a
       defendant makes a reasonably timely request (whereas an untimely

20     request is subject to the trial court's discretion based on prescribed
       factors)."  (People v. Watts (2009) 173 Cal. App.4th 621, 629

21     (Watts).)

22         Defendant initially made a Faretta request in early December 2009,
       but when questioned by the trial court defendant said he wanted a

23     Marsden hearing (People v. Marsden (1970) 2 Cal.3d 118), which
       the trial court held immediately.  The trial court denied the request

24     for new counsel.  On December 28, 2009, the day before trial,
       counsel again mentioned that defendant had made a Faretta

25     request.  Defendant was still in the holding area at the time but was
       loud enough to be heard in the courtroom.  Judge Anderson

26     commented that defendant had been making loud, hostile noise

8

from the holding area, and that the judge could still hear the commotion when the door was closed.  Judge Anderson said he had expressed concern for the court's safety but had been assured by the bailiff that extra staff was present to deal with defendant.

After defendant was brought into the courtroom, Judge Anderson asked him about the commotion in the holding area.  Defendant responded, "Right now?  Oh, I'm putting this guy out.  Oh, boy, this guy is fit to be tied.  Oh, that's right.  He's up in a – hey, I don't like judges.  Right off the bat, I guess, you want to send me out, Anderson.  I guess, that is who you are.  Oh, sure, Anderson."  Judge Anderson asked defendant what he wanted the court to do and defendant replied, "Can you tell me?  I can't remember.  Oh, I want, I guess, I would like another attorney or act as my own attorney.  The judge is real too cool and an asshole or butthole.  That is not – that is coming out wrong."  The trial judge tried to interrupt by saying defendant's name, but defendant continued to talk, adding "You talking to me?  You can call me Mr. Zamora.  My dad is dead."  The trial judge said defendant's behavior was disruptive.  Defendant asked, "Who you talking to?"  When the trial judge indicated that he was talking to defendant, defendant responded, "Then why are you looking at these guys?"

The trial judge decided to have defendant removed from the courtroom, saying "The court cannot get a word in edgewise."  Defendant responded, "Take it easy, everyone.  You have all been so nice.  Especially you, you asshole, fucking idiot, Judge Anderson."  The trial court denied defendant's <u>Faretta</u> request because "his conduct was so disruptive.  He wouldn't allow the court to talk.  I had to remove him so that we could conduct court proceedings and in some kind of orderly fashion.  So I'm ruling his self-representation [request] is denied because of his disruptive behavior."

<u>Faretta</u> warned that a trial court "may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct."  (<u>Faretta</u>, <u>supra</u>, 422 U.S. at pp. 834–835, fn. 46 [45 L.Ed.2d at p. 581].)  According to the California Supreme Court, "the same rule applies to the denial of a motion for self-representation in the first instance when a defendant's conduct prior to the <u>Faretta</u> motion gives the trial court a reasonable basis for believing that his self-representation will create disruption."  (<u>People v. Welch</u> (1999) 20 Cal.4th 701, 734 (<u>Welch</u>); <u>Watts</u>, <u>supra</u>, 173 Cal. App.4th at pp. 629–630.)

"'The right of self-representation is not a license to abuse the dignity of the courtroom.  Neither is it a license not to comply with relevant rules of procedural and substantive law.'  [Citation.] . . . '[A]n accused has a Sixth Amendment right to conduct his own defense, provided only that he knowingly and intelligently forgoes his right to counsel and that he is able and willing to abide by rules

9

of procedure and courtroom protocol.' [Citation.] This rule is obviously critical to the viable functioning of the courtroom. A constantly disruptive defendant who represents himself, and who therefore cannot be removed from the trial proceedings as a sanction against disruption, would have the capacity to bring his trial to a standstill." (Welch, supra, 20 Cal.4th at p. 734, italics omitted.)

"Thus, a trial court must undertake the task of deciding whether a defendant is and will remain so disruptive, obstreperous, disobedient, disrespectful or obstructionist in his or her actions or words as to preclude the exercise of the right to self-representation." (Welch, supra, 20 Cal.4th at p. 735.) The extent of a defendant's disruptive behavior may not be fully evident from the cold record and the trial court is in the best position to judge the defendant's demeanor. (Ibid.) Accordingly, we defer to the trial court's exercise of discretion absent a strong showing of clear abuse. (Ibid.)

Here, defendant created a disruption in the holding area which could be heard in the courtroom, repeatedly interrupted the trial court, and shouted obscenities at the judge. Under the circumstances, the trial court did not abuse its discretion in denying the Faretta motion because defendant "manifested an inability to conform his conduct to procedural rules and courtroom protocol." (Watts, supra, 173 Cal. App.4th at p. 630; see also People v. Howze (2001) 85 Cal. App.4th 1380, 1397 [no abuse of discretion in denial of Faretta motion where defendant was obstreperous and created a risk of disrupting the proceedings].)

Defendant argues the trial court erred by not granting the Faretta motion and appointing standby counsel in case defendant became disruptive at trial. He asserts the United States Supreme Court indicated this is the proper method to handle the potential for obstructionist conduct by a defendant acting as his own attorney.

Defendant takes the comments made by the Supreme Court out of context. In a footnote in Faretta, the Supreme Court rejected the generic concern that criminal defendants representing themselves might use the courtroom for deliberate disruption of their trials, observing that the right of self-representation had "been recognized from our beginnings" and yet "no such result has thereby occurred." (Faretta, supra, 422 U.S. at p. 834, fn. 46 [45 L.Ed.2d at p. 581, fn. 46].) If a defendant deliberately engaged in obstructionist misconduct, the trial judge could terminate self-representation. (Ibid.) And, "a State may . . . appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary." (Ibid.)

/////

1

> Nothing in <u>Faretta</u> suggests, however, that a state must appoint standby counsel, rather than denying a motion for self-representation, where a defendant has already been disruptive and already demonstrated an inability or unwillingness to comply with courtroom procedure and protocol.  "It would be a nonsensical and needless waste of scarce judicial resources to [grant the <u>Faretta</u> request and] proceed to trial when, as here, defendant has shown by his conduct during pretrial proceedings that he is unable to conform to procedural rules and protocol."  (<u>Watts</u>, <u>supra</u>, 173 Cal. App.4th at p. 630.)

2

3

4

5

6

> Citing <u>People v. Windham</u> (1977) 19 Cal.3d 121, 128–129 (<u>Windham</u>), defendant asserts that the trial court abused its discretion by denying his <u>Faretta</u> request without developing a meaningful record for appellate review.  But <u>Windham</u> is inapposite.  The factors enumerated there pertain to a midtrial request for self-representation.  (<u>Id</u>. at p. 128.)  The factors pertain more to the timing of the request and do not address defendant's disruptive behavior or his inability or unwillingness to conform his conduct to procedural rules and courtroom protocol.

7

8

9

10

11

> Under the circumstances, defendant fails to establish that the trial court abused its discretion in denying his <u>Faretta</u> request.

12

13   (Opinion at 33-39.)

14          The United States Supreme Court has held that a criminal defendant has a

15   constitutional right to represent himself at trial.  <u>Faretta v. California</u>, 422 U.S. 806, 832 (1975).

16   "The Constitution does not allow the government '[t]o thrust counsel upon the accused, against

17   his considered wish, in contravention of the 'nearly universal conviction, on the part of our

18   people as well as our courts, that forcing a lawyer upon an unwilling defendant is contrary to his

19   basic right to defend himself if he truly wants to do so.'"  <u>United States v. Gerritsen</u>, 571 F.3d

20   1001, 1007 (9th Cir. 2009) (internal citations omitted).  However, in order to secure the right to

21   represent himself at trial, a criminal defendant must be "able and willing to abide by rules of

22   procedure and courtroom protocol."  <u>McKaskle v. Wiggins</u>, 465 U.S. 168, 173 (1984).  <u>See</u> <u>also</u>

23   <u>United States v. Bishop</u>, 291 F.3d 1100, 1114 (9th Cir. 2002).

24          The court in <u>Faretta</u> observed that a trial judge "may terminate self-representation

25   by a defendant who deliberately engages in serious and obstructionist misconduct . . . .  The right

26   of self-representation is not a license to abuse the dignity of the courtroom."  <u>Faretta</u>, 422 U.S. at

834 n.46.  This language has been applied to deny the right of self representation to disruptive

defendants in federal criminal trials.  See, e.g., United States v. Mack, 362 F.3d 597, 601 (9th

Cir. 2004) (a criminal defendant forfeits his right to represent himself in the proceeding when he

"acts out"); United States v. Lopez–Osuna, 232 F.3d 657, 665 (9th Cir. 2000) (holding that a trial

court may refuse a defendant's request to represent himself when he is unable or unwilling to

abide by rules of procedure and courtroom protocol); United States v. Frazier-El, 204 F.3d 553,

559 (4th Cir. 2000) (upholding trial court's decision to deny petitioner's Faretta request based on

his failure to cooperate with the court); United States v. Keiser, 319 Fed. Appx.457, 2008 WL

4280003 at *1 (9th Cir. Sept.17, 2008) ("the right to self-representation does not overcome the

court's right to preserve courtroom order").[5]  As the United States Supreme Court has explained:

> It is essential to the proper administration of criminal justice that
> dignity, order, and decorum be the hallmarks of all court
> proceedings in our country.  The flagrant disregard in the
> courtroom of elementary standards of proper conduct should not
> and cannot be tolerated.  We believe trial judges confronted with
> disruptive, contumacious, stubbornly defiant defendants must be
> given sufficient discretion to meet the circumstances of each case.

Illinois v. Allen, 397 U.S. 337, 343 (1970).   Accordingly, it has been recognized that the

"government's interest in ensuring the integrity and efficiency of the trial at times outweighs the

defendant's interest in acting as his own lawyer."  Martinez v. California, 528 U.S. 152, 162

(2000).

         In this case, the trial court did not terminate petitioner's right to represent himself,

but rather denied his request in the first instance based on the potential for disruption of the

proceedings.  The California Court of Appeal concluded that the trial court's ruling did not

violate the holding in Faretta.  For the reasons set forth below, this court concludes that the

California Court of Appeal's decision in this regard is not contrary to or an unreasonable

---

[5]  In Faretta, the trial judge accepted the defendant's pretrial waiver of counsel and
allowed him to proceed pro se but then revoked that acceptance, still prior to trial, and required
him to conduct the trial represented by counsel.  422 U.S. at 807-10.

application of clearly established federal law, nor is it based on an unreasonable determination of the facts of this case.

Several federal appellate decisions are instructive in addressing this claim.  In United States v. Flewitt, 874 F.2d 669 (9th Cir. 1989), the Ninth Circuit concluded that the trial court violated the defendants' Faretta rights by terminating their right to self-representation on the grounds that they were uncooperative with the government in utilizing discovery opportunities and had made vague and poorly formulated motions.  The appellate court held that these actions did not provide a sufficient basis upon which to terminate the defendants' pro se status.  Rather, it advised that for purposes of deciding whether a criminal defendant may proceed pro se, "[p]retrial activity is relevant only if it affords a strong indication that the defendants will disrupt the proceedings in the courtroom."  Id. at 674.  In reaching this conclusion, the court in Flewitt specifically noted Faretta's admonition that the right of self-representation "is not a license to abuse the dignity of the courtroom."  Id.

In United States v. Brock, 159 F.3d 1077, 1079 (7th Cir. 1998), the trial court terminated the defendant's previously granted pro se status before trial after the defendant repeatedly refused to answer the court's questions, challenged the court's jurisdiction and demanded a Bill of Particulars.  The appellate court stated, "when a defendant's obstreperous behavior is so disruptive that the trial cannot move forward, it is within the trial judge's discretion to require the defendant to be represented by counsel."  Id.  The appellate court explained that the defendant's "steadfast refusal to answer the court's questions made it extremely difficult for the court to resolve threshold issues, such as whether the defendant would be represented by counsel," and that he "did not simply refuse to prepare for trial, he refused to cooperate, even minimally, with the court."  Id.  The Seventh Circuit concluded that it was "reasonable for the trial court to conclude that Brock's behavior strongly indicated that he would continue to be disruptive at trial."  Id. at 1080-81 (footnote omitted).

/////

1    Finally, in <u>United States v. Long</u>, 597 F.3d 720 (5th Cir. 2010), the Fifth Circuit

2    concluded that even if the defendant's ambiguous remarks constituted a request for self-

3    representation, he had waived any right to self-representation by his disruptive, uncooperative,

4    and obstructionist conduct.  <u>Id.</u> at 726-27.

5    The decisions in <u>Brock</u>, <u>Flewitt</u>, and <u>Long</u> indicate that when pretrial behavior

6    strongly indicates that a defendant will be disruptive at trial, a trial court is justified in refusing to

7    allow the defendant to act as his own attorney.  Here, the record amply supports the state courts'

8    finding that petitioner displayed disruptive behavior of sufficient seriousness to justify denial of

9    self-representation.  In particular, petitioner's behavior "manifested an inability to conform his

10   conduct to procedural rules and courtroom protocol."  (Opinion at 37.)  The record before this

11   court reflects that at virtually every hearing in the state trial court, petitioner's behavior was rude

12   and obstreperous.  For instance, prior to petitioner's <u>Marsden</u> hearing, petitioner stated to Judge

13   Ruggiero, "Why don't you fucking shove it up your fucking ass."  (Reporter's Transcript on

14   Appeal (RT) at 3.)  Later, in front of Judge Anderson, the proceedings were brought to a

15   standstill by petitioner's actions.  After having petitioner removed from the courtroom, Judge

16   Anderson stated that petitioner's behavior was "not only disruptive, it is contemptuous."  (<u>Id.</u> at

17   17.)  Under these circumstances, it was reasonable to conclude that petitioner's pretrial behavior

18   strongly indicated he would continue to be disruptive at trial.  Indeed, during his trial petitioner

19   had to be removed from the courtroom again when, among other outbursts, he called the

20   prosecutor a "lying sack of shit" and informed the trial judge that he didn't "want to hear his

21   goddam fucking bullshit."  (<u>Id.</u> at 64.)  <u>Faretta</u> does not suggest, and the United States Supreme

22   Court has never held, that a trial judge must first permit a defendant to proceed pro se even when

23   the defendant's prior behavior has made clear that allowing him to represent himself would

24   seriously disrupt the trial proceedings.  <u>See Marshall v. Taylor</u>, 395 F.3d 1058, 1060-61 (9th Cir.

25   2005) ("Because the Supreme Court has not clearly established when a <u>Faretta</u> request is

26   /////

14

1  untimely, other courts are free to do so as long as their standards comport with the Supreme

2  Court's holding that a request "weeks before trial" is timely.)

3          For the reasons set forth above, the California Court of Appeal's decision

4  rejecting petitioner's argument that his <u>Faretta</u> motion was erroneously denied comports with the

5  holding in <u>Faretta</u>, and with the federal appellate courts' recognition of the predictive value of a

6  defendant's pretrial behavior in this context.  The state court's determination therefore is

7  consistent with the principles and standards flowing from the holding of <u>Faretta</u>.[6]

8          Nor was the trial court required to grant petitioner's <u>Faretta</u> request and appoint

9  his trial attorney as "standby counsel."  There is no federal constitutional right to the assistance

10  of standby counsel.   <u>See</u> <u>McKaskle</u>, 465 U.S. at 183 ("<u>Faretta</u> does not require a trial judge to

11  permit 'hybrid' representation . . . .").  <u>See also</u> <u>United States v. Mendez-Sanchez</u>, 563 F.3d 935,

12  947 (9th Cir. 2009) ("under our established precedent there is no right to the assistance of

13  standby counsel").  Although the trial judge could have appointed standby counsel he was not

14  constitutionally required to do so, and his failure to consider this option under the circumstances

15  presented here was not improper and did not violate petitioner's <u>Faretta</u> rights.  This court also

16  notes that petitioner bitterly complained throughout the proceedings about his appointed trial

17  counsel and tried to have another attorney substitute in his place.  Accordingly, it appears that

18  appointing petitioner's trial counsel as "standby counsel" would have not have been helpful in

19  preventing petitioner's outbursts or in moving the trial along.

20  /////

21

---

22          [6] Respondent notes that in a dissenting opinion, U.S. Supreme Court Justice Scalia has
stated that although <u>Faretta</u> holds that a court may terminate the self-representation of a
23  defendant who commits serious misconduct, "this ground for terminating self-representation is
unavailable here . . . because [the defendant] was not even allowed to begin to represent himself,
24  and because he was respectful and compliant and did not provide a basis to conclude a trial could
not have gone forward had he been allowed to press his own claims."  <u>Indiana v. Edwards</u>, 554
25  U.S. 164, 185-86 (2008) (dissenting opinion).  This statement in dicta does not apply here
because petitioner's behavior provided ample basis for the trial judge to conclude that the trial
26  could not go forward in any way approaching an orderly fashion if petitioner was allowed to
represent himself.

1      For the foregoing reasons, petitioner is not entitled to federal habeas relief with

2  respect to his Sixth Amendment/<u>Faretta</u> claim.

3      B. <u>Shackling</u>

4      Petitioner next claims that the trial court violated his right to due process when it

5  ordered him shackled during trial without adequate justification and without considering or

6  attempting less visible security alternatives.  (Pet. at 12.)  He argues that the trial court

7  improperly failed to make a determination that shackles were justified by safety or flight

8  concerns.  (<u>Id.</u> at 14.)  Petitioner also contends that his "verbal outbursts" in the courtroom did

9  not justify the use of restraints because those restraints did not prevent him from speaking and

10  might have actually increased the risk that he would disrupt the proceedings by making him more

11  agitated.  (<u>Id.</u> at 14-15.)

12      Petitioner also argues that shackles should only have been used as a "last resort"

13  and that the trial judge should have considered less obtrusive alternatives before resorting to their

14  use.  (<u>Id.</u> at 15-16.)  He argues that a "bandit" (a device worn under the clothing which delivers

15  an electric shock when activated by a remote device) could have adequately restrained him and

16  should have been attempted before the resorting to the use of shackles.  (<u>Id.</u> at 15, 16.)  Petitioner

17  also suggests that the trial court could have used "a screen that hangs over the defense table" or a

18  "covering that goes over the shackles themselves."  (<u>Id.</u>)  He argues these alternatives would have

19  made the shackles less visible to the jury.  (<u>Id.</u>)  Petitioner further argues that the trial judge

20  improperly "abdicated [his] decision-making authority to security personnel" when he deferred to

21  the opinion of a courtroom officer that petitioner should be shackled during the trial.  (<u>Id.</u> at 16-

22  17.)

23      Finally, petitioner argues that his shackling at trial prejudiced him.  (<u>Id.</u> at 17-18.)

24  He states that the trial judge "called the jury's attention to Zamora's shackles as soon as the panel

25  entered the courtroom" and that this "undermined the presumption of innocence."  (<u>Id.</u> at 17.)  He

26  argues that the inherent prejudice from the shackles was exacerbated when he was removed from

1  the courtroom.  (Id.)  Petitioner also states that "nothing in the record" shows that his shackles

2  were removed before he testified, and he argues that the wearing of shackles on the witness stand

3  undermined his credibility in a case where the credibility of the witnesses was crucial.  (Id.)

4          In the last reasoned state court decision on this claim, the California Court of

5  Appeal rejected petitioner's arguments regarding his shackling, reasoning as follows:

6        Defendant also contends that the trial court abused its discretion in
         ordering that he wear shackles during trial.

7

8        We review the trial court's decision to impose restraints for an
         abuse of discretion.  (People v. Mar (2002) 28 Cal.4th 1201, 1217
9        (Mar).)  A defendant cannot be physically restrained in the jury's
         presence absent a showing of a manifest need for the restraints.
10       (People v. Hill (1998) 17 Cal.4th 800, 841.)  Manifest need may
         arise from "a showing of unruliness, an announced intention to
11       escape, or '[e]vidence of any nonconforming conduct or planned
         nonconforming conduct which disrupts or would disrupt the
12       judicial process if unrestrained . . . .' [Citation.]"  (People v. Cox
         (1991) 53 Cal.3d 618, 651, disapproved on other grounds in People
13       v. Doolin (2009) 45 Cal.4th 390, 421, fn. 22.)  The conduct which
         supports a showing of manifest need must appear as a matter of
14       record.  (People v. Vance (2006) 141 Cal. App.4th 1104, 1112
         (Vance).)

15       A defendant's behavior outside of the courtroom may justify use of
         restraints within the courtroom.  (People v. Price (1991) 1 Cal.4th
16       324, 402–404.)  While a record of violent crime cannot alone
         justify a decision to permit shackles, the court may consider
17       evidence of violent or nonconforming conduct while in custody.
         (People v. Hawkins (1995) 10 Cal.4th 920, 944, disapproved on
18       another point in People v. Lasko (2000) 23 Cal.4th 101, 107, 110.)
         "[W]hen the imposition of restraints is to be based upon conduct of
19       the defendant that occurred outside the presence of the court,
         sufficient evidence of that conduct must be presented on the record
20       so that the court may make its own determination of the nature and
         seriousness of the conduct and whether there is a manifest need for
21       such restraints; the court may not simply rely upon the judgment of
         law enforcement or court security officers or the unsubstantiated
22       comments of others."  (Mar, supra, 28 Cal.4th at p. 1221.)

23       "A trial court abuses its discretion if it abdicates this
         decisionmaking responsibility to security personnel or law
24       enforcement."  (People v. Hill, supra, 17 Cal.4th at p. 841.)  "The
         record must demonstrate that the trial court independently
25       determined on the basis of an on-the-record showing of
         defendant's nonconforming conduct that 'there existed a manifest

26 /////

need to place defendant in restraints.' [Citation.]" (Mar, supra, 28 Cal.4th at p. 1218.)

On the first day of trial, defense counsel objected to the fact that defendant's hands and feet were shackled to a waist chain because this would lead the jury to believe that defendant was dangerous. Judge Halpin did not say that he was aware of defendant's unruly behavior at the prior pretrial proceedings before Judge Ruggiero or Judge Anderson, but this is a reasonable inference given that the trial court stated it "had the Marshals bring over the jail file on this defendant . . . ." The trial court marked the file as court's exhibit No. 1 and observed it contained "voluminous information about problems that they've had with [defendant] with respect to his custody status."

After defense counsel "reviewed a small portion of th[e] file," he did not object to the use of restraints, he only objected to the type of restraint. Defense counsel argued that less visible restraints should be used such as a "bandit," which is an electric shock device worn on the calf under clothing. It delivers a 50,000 volt shock after it is activated remotely by the bailiff.

The trial court asked Deputy Sampson, who prepared the restraint assessment file and recommended the type of restraint, why she believed shackles were appropriate. Deputy Sampson stated that other devices would not sufficiently confine defendant to a level necessary to protect the court, jurors, counsel and security staff. With the bandit, when a defendant makes an aggressive move and the bailiff presses the remote button to activate it, there is a warning delay. When the bandit was tested on Deputy Sampson, she was able to remain standing and take a step. Waist and leg chains limit mobility and the ability to strike out and injure others.

Deputy Sampson acknowledged that the bandit could be activated before defendant walked ten feet, and she was not aware of any physical aggression by defendant toward defense counsel, only verbal hostility. Defense counsel argued that because he was the only person within five or ten feet of defendant, a bandit would suffice to protect others in the courtroom. Defense counsel asked that if the trial court disagreed, the jury be given a limiting instruction regarding defendant's shackles.

The trial court ruled that defendant be restrained with waist chains and leg irons, but it was willing to change its ruling if it became apparent that restraints were not necessary. The trial court instructed the jury – prior to voir dire, during pre-trial instructions, and after the close of evidence – that it must disregard and should not be influenced by the fact defendant was in physical restraints. The trial court also advised the jurors to disregard any outbursts he

/////

18

might make because the issue was whether he committed the charged crimes, not whether he was outlandish.[7]

Defendant contends the trial court abused its discretion in ordering that he wear shackles when his conduct did not demonstrate a potential for violence or a risk of escape. He maintains that verbal outbursts do not justify imposing restraints, that the trial court abdicated its discretion regarding whether to restrain defendant, and it failed to make the requisite showing on the record that restraints were required. Defendant also contends that even if restraints were justified, the trial court should have used less obtrusive means.

Defendant does not support his claim that the trial court failed to make a sufficient showing on the record, because he did not include his jail file, court's exhibit No. 1, in the appellate record. Although "[t]he burden is on the People to establish in the record the manifest need for the shackling" (Vance, supra, 141 Cal. App.4th at p. 1112), this refers to the burden in the trial court. On appeal, the appellant must provide an adequate record to support his or her claim of prejudicial error or the error is forfeited. (Ballard v. Uribe (1986) 41 Cal.3d 564, 574–575; People v. Malabag (1997) 51 Cal. App.4th 1419, 1427; People v. Clifton (1969) 270 Cal. App.2d 860, 862.) The trial court relied on defendant's jail file in ruling that shackles were necessary, and defendant cannot undermine this ruling by failing to include the exhibit in the appellate record and then asserting that the record is insufficient.

We could deem the matter forfeited given defendant's failure to provide an adequate record on appeal. Instead, we agree with the People that it is reasonable to infer that information in the probation report about defendant's in-custody behavior was similar to that contained in his jail file. Defendant had been a problem for jail staff. He refused to take medications for his bipolar disorder and was irritable, belligerent, aggressive and confrontational. The jail staff had to move defendant "off the pods on four occasions for vandalism and destruction of property, five times for 'gassing,' and nine times for major rule violations." He was disciplined for disrespecting staff, not following orders, assaulting an officer, attempting to assault an officer, and threatening staff.

/////

---

[7]   During trial, defendant called the judge a "fucking idiot," an "asshole," a "fucking liar" and a "lying sack of shit;" called the bailiff a "cunt," which defendant claimed was an acronym for "Cannot Understand Normal Thinking;" and told the prosecutor he wanted to "fucking knock you in your goddam [sic] fucking mouth and in the nose." Among other things, the jury heard defendant tell the judge, "Shut up. Don't talk to me, you bastard," and "You're a goddam [sic] fucking idiot."

There is also ample evidence of defendant's tendency to disrupt the courtroom.  He hurled epithets and profanities at three different judges during three pretrial proceedings.[8]  While his behavior was primarily verbal, it was highly disruptive, causing the trial court to remove him from the courtroom on one occasion.  There is no minimum ratio of disruptive to acceptable behavior before a trial court may restrain a disruptive defendant, and defendant's pretrial outbursts were too frequent and too severe for the trial court to ignore.

Nor did the trial court abdicate its discretion to security personnel; it simply relied on Deputy Sampson's expertise regarding how the various methods of restraint worked before making its own decision based on her testimony and its review of defendant's jail file.[9]

In any event, defendant was not prejudiced by the shackling.  Error in the use of restraints is harmless if there is no evidence the jury was aware that a defendant was shackled or only briefly observed the restraints, and there is no evidence that the shackles impaired or prejudiced the defendant's right to testify or participate in his or her defense.  (People v. Cunningham (2001) 25 Cal.4th 926, 988–989; People v. Anderson (2001) 25 Cal.4th 543, 596; People v. Tuilaepa (1992) 4 Cal.4th 569, 583–584.)

Defendant's leg restraints were visible briefly when the jury entered the courtroom, but there is no clear indication that the jurors' observation of the restraints occurred at other times.  Defendant does not allege that his ability to communicate with his lawyer or participate in his own defense was adversely affected by the shackles.  When defendant testified, he stood and raised his right hand to be sworn in, indicating he was not shackled during his testimony.

/////

---

[8]  At the November 3, 2009 preliminary hearing, defendant interjected, "It's all bullshit. God damn it" and told Judge Curle, "I think you're a fucking idiot you God damn judge."  On December 9, 2009, after Judge Ruggiero told defendant to be quiet, defendant responded, "Why don't you fucking shove it up your fucking ass."  Defendant's behavior at the Faretta hearing before Judge Anderson is discussed above in part I of the opinion.

[9]  At one point the trial court stated:  "Well, I'm going to go ahead and proceed with the restraints on.  The Court has a duty to make sure that everybody is safe.  He also has a duty to make sure the defendant gets a fair trial.  And it's difficult to overrule the people that are responsible for safety.  [¶]  With all due respect to you, [defense counsel], and with due respect to myself, we don't know that much about it.  So I am going to go ahead."  Although it is possible to construe this comment as deference to Deputy Sampson's judgment, the complete record shows that the trial court reviewed defendant's jail file, brought in Deputy Sampson to testify about the matter, and made its own decision.

1
2
3
4
5
6

> The record does not establish that defendant's shackles "shocked [the jury] or affected their assessment of the evidence." (People v. Tuilaepa, supra, 4 Cal.4th at p. 585.) If anything, the jury was more likely to be shocked by defendant's crude and disruptive outbursts. Moreover, the evidence against defendant was strong and straightforward, contradicted only by defendant's rambling and, at times, nonsensical testimony. We are convinced beyond a reasonable doubt that the jury would have returned the same verdict had defendant not been shackled. (Deck v. Missouri (2005) 544 U.S. 622, 635 [161 L.Ed.2d 953, 966].)

7    (Opinion at 39-46.)

8            The Sixth and Fourteenth Amendments to the United States Constitution assure a

9    criminal defendant the right to a fair trial. See Estelle v. Williams, 425 U.S. 501, 503 (1976).

10   Visible shackling of a criminal defendant during trial "undermines the presumption of innocence

11   and the related fairness of the factfinding process" and "'affront[s]' the 'dignity and decorum of

12   judicial proceedings that the judge is seeking to uphold.'" Deck v. Missouri, 544 U.S. 622,

13   630-31 (2005) (quoting Illinois v. Allen, 397 U.S. at 344). See also Larson v. Palmateer, 515

14   F.3d 1057, 1062 (9th Cir. 2008). The Supreme Court has therefore held that "the Fifth and

15   Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial

16   court determination, in the exercise of its discretion, that they are justified by a state interest

17   specific to a particular trial." Deck, 544 U.S. at 629. Those interests include "physical security,"

18   "courtroom decorum" and "courtroom security." Id. at 624, 628. Accordingly, criminal

19   defendants have "the right to be free of shackles and handcuffs in the presence of the jury, unless

20   shackling is justified by an essential state interest." Ghent v. Woodford, 279 F.3d 1121, 1132

21   (9th Cir. 2002). See also Jones v. Meyer, 899 F.2d 883, 884 (9th Cir. 1990); Wilson v.

22   McCarthy, 770 F.2d 1482, 1484 (9th Cir. 1985).

23           Shackling is not unconstitutionally prejudicial per se. Illinois v. Allen, 397 U.S.

24   at 343-44; Duckett v. Godinez, 67 F.3d 734, 748 (9th Cir. 1995) ("shackling is inherently

25   prejudicial, but it is not per se unconstitutional"). Unjustified shackling does not rise to the level

26   of constitutional error unless the defendant makes a showing that he suffered prejudice as a

21

1   result.  Ghent, 279 F.3d at 1132 (citing United States v. Olano, 62 F.3d 1180, 1190 (9th Cir

2   1995) and United States v. Halliburton, 870 F.2d 561-62)).  See also Larson, 515 F.3d at 1064

3   (state trial court's violation of the petitioner's due process rights in requiring him to wear security

4   leg brace during trial, found to be harmless).  The Ninth Circuit has held that "the greater the

5   intensity of shackling and the chains' visibility to the jurors, the greater the extent of prejudice."

6   Spain v. Rushen, 883 F.2d 712, 722 (9th Cir. 1989).  Thus, it has been recognized that "physical

7   restraints such as a waist chain, leg irons or handcuffs may create a more prejudicial appearance

8   than more unobtrusive forms of restraint."  Larson, 515 F.3d at 1064.

9            In a federal habeas corpus proceeding such as this one, the federal court must

10   determine whether any error had a "substantial and injurious effect" on the jury's verdict.  Brecht

11   v. Abrahamson , 507 U.S. 619, 623 (1993); Larson, 515 F.3d at 1064.  See also Fry v. Pliler, 551

12   U.S. 112, 121-22 (2007) (Brecht harmless error review applies whether or not the state court

13   recognized the error and reviewed it for harmlessness).  In this context, a federal habeas court is

14   to "determine whether what [the jurors] saw was so inherently prejudicial as to pose an

15   unacceptable threat to defendant's right to a fair trial."  Holbrook v. Flynn, 475 U.S. 560, 572

16   (1986).  In the Ninth Circuit, "only the most egregious kind of shackling has been found . . . to

17   deny due process."  Castillo v. Stainer, 983 F.2d 145, 148 (9th Cir. 1991).

18            The California Court of Appeal concluded that the trial court's decision to use

19   shackles on petitioner during his trial in order to maintain courtroom security was justified by the

20   "ample evidence" of petitioner's "tendency to disrupt the courtroom."  (Opinion at 44.)  The state

21   appellate court also found that the trial court exercised its own discretion in the matter and did

22   not improperly delegate that discretion to courtroom security personnel.  (Id. at 45.)  Those

23   findings are not based on an unreasonable determination of the facts of this case and have not

24   been rebutted by petitioner by clear and convincing evidence.  See 28 U.S.C. § 2254(d)(2), (e)(1).

25            As explained by the California Court of Appeal, the state court record reflects that

26   petitioner's behavior was unruly, disruptive, and menacing both in jail and virtually every time

he was in the courtroom. These circumstances fully support the trial judge's decision that restraints of some kind were justified by reasonable concerns about "physical security," "courtroom decorum," and "courtroom security." Deck, 544 U.S. at 624, 628.  Indeed, even petitioner's trial counsel appeared to agree that the use of some form of restraint was in order.

The state court record does not support petitioner's argument that the trial judge improperly delegated his authority to decide which restraints to use to courtroom security personnel.  As explained by the California Court of Appeal, the trial judge extensively examined Sheriff's Deputy Sampson, who had reviewed petitioner's jail file and recommended the use of waist chains and leg irons during trial.  After hearing Deputy Sampson's testimony and argument from petitioner's counsel, the trial judge ruled that he would proceed with the restraints that petitioner was currently wearing.  (Id. at 32.)  In so ruling, the trial judge explained:

> The court has a duty to make sure that everybody is safe.  He also has a duty to make sure the defendant gets a fair trial.  And it's difficult to overrule the people that are responsible for safety.
>
> With all due respect to you, Mr. Hammonds (petitioner's counsel) and with due respect to myself, we don't know that much about it. So I am going to go ahead.  I'm mindful of the fact that it could be a problem for the jury and I'm prepared to instruct them now or when they first come or when it seems to be necessary – your choice – with respect to the care they must exercise, not to let that interfere with their judgment.
>
> When I say it's your choice.  I'm not sure that it's necessary, unless we really feel that the jury is going to be aware of what happens.

(Id.)

Although the judge stated it was "difficult to overrule the people that are responsible for safety," as indicated by the state appellate court, a review of the record as a whole reflects that the trial judge did not abdicate his responsibility to Deputy Sampson but simply decided, after hearing her testimony and the argument of petitioner's trial counsel, to proceed with the waist chain and leg irons that petitioner was then wearing.  The judge did not delegate his authority to Deputy Sampson; he simply concluded that he agreed with her assessment of the

23

1    security measures that were necessary under the circumstances.  This was not improper and it did

2    not violate petitioner's right to a fair trial.

3               Petitioner's argument that the trial court should have considered less restrictive

4    alternatives to shackling is unavailing.  The United States Supreme Court clarified in Deck that

5    the requirement to consider less restrictive alternatives was not clearly established Supreme

6    Court law at that time, and the Supreme Court has not since ruled on the issue.  Crittenden v.

7    Ayers, 624 F.3d 943, 971-72 (9th Cir. 2010).  Therefore, "even if the trial court did not weigh the

8    benefits and burdens of shackling or consider less restrictive alternatives, . . . clearly established

9    federal law did not require it to do so."  Id. at 972.  Here, the trial court provided the

10   individualized determination of necessity required by the Supreme Court in Deck, and concluded

11   that the waist chain and leg irons were justified by the court's interest in maintaining the security

12   of the courtroom, given petitioner's extremely aggressive and angry outbursts.  The conclusion of

13   the California Court of Appeal that the trial judge's ruling did not violate petitioner's Sixth and

14   Fourteenth Amendment rights is not contrary to or an unreasonable application of federal law and

15   should therefore not be set aside.

16              Even assuming arguendo that the trial court erred in allowing petitioner to be

17   shackled during trial, petitioner has failed to show that any error had a substantial and injurious

18   effect on the verdict.  In this § 2254 proceeding, in order to obtain relief petitioner must show not

19   only that he was physically restrained, that the shacking was seen by the jury and that the

20   physical restraint was not justified by legitimate state interests but also that he suffered prejudice

21   as a result of the unjustified shackling.  Ghent, 279 F.3d at 1132; see also Larson, 515 F.3d at

22   1064 (finding that petitioner failed to show that "wearing the leg brace for the first two days of a

23   six-day trial had a substantial and injurious effect or influence in determining the jury's verdict");

24   Duckett, 67 F.3d at 749 ("Shackling, except in extreme forms, is susceptible to harmless error

25   analysis"); Pember v. Ryan, No. CV-11-1600-PHX-SMM (LOA), 2012 WL 4747175, at *15

26   (June 19, 2012 D. Az.); Wagener v. Kenan, No. 07-CV-1584-JLS (BLM), 2008 WL 3925721, at

24

1   *39 (S.D. Cal. Aug. 22, 2008).  Indeed, the Ninth Circuit has observed that it has "held that the

2   unconstitutional shackling of a defendant results in prejudice only if the evidence of guilt is not

3   overwhelming."  Cox. v. Ayers, 613 F.3d 883, 891 (9th Cir. 2010).  See also Dyas v. Poole, 317

4   F.3d 934, 937 (9th Cir. 2003).

5              Here, it is true that petitioner's waist chain and leg irons were a more substantial

6   type of restraint than other, more unobtrusive forms.  However, even though petitioner's

7   restraints were apparently subject to the jury's view, there is no evidence the shackles were made

8   patently obvious or that they prevented or restricted the defense from presenting its case.

9   Further, the evidence against petitioner was substantial, even overwhelming, particularly given

10  petitioner's fantastical and sometimes incoherent testimony.  See Larson, 515 F.3d at 1064

11  (concerns about prejudice may be mitigated if the evidence against the defendant was

12  overwhelming).  The jury was instructed several times to disregard the fact that petitioner was in

13  physical restraints.  (RT at 45-46 (instructing jury not to be influenced by petitioner's restraints

14  or by any outbursts he might make); id. at 224 (informing the jury that petitioner's physical

15  restraints were not evidence and that jurors must "completely disregard this circumstance in

16  deciding the issues in this case")).  They are presumed to have followed these instructions.

17  Kansas v. Marsh, 548 U.S. 163, 179 (2006); Richardson v. Marsh, 481 U.S. 200, 211 (1987);

18  Fields v. Brown, 503 F.3d 755, 782 (9th Cir. 2007).  In short, there is no indication from the

19  record that the jury verdict would have been different if petitioner had not been shackled during

20  his trial.

21              For the foregoing reasons, petitioner is not entitled to federal habeas relief with

22  respect to this claim.

23       C.  Ineffective Assistance of Trial Counsel

24              Petitioner's last claim is that his trial counsel rendered ineffective assistance in

25  failing to impeach D.R. with discrepancies between D.R.'s trial testimony and his statements to

26  Police Officer Bullington at the scene, as related by Bullington in his testimony at petitioner's

25

preliminary hearing.  (Pet. at 22-25.)  Petitioner argues that his trial counsel's failure to highlight these inconsistencies prejudiced his defense because D.R. provided the majority of the evidence against him at trial, including the only evidence in support of the attempted kidnapping charge. (Id. at 22-25.)[10]

Petitioner states that the "most important" discrepancy that his trial counsel should have explored was Officer Bullington's preliminary hearing testimony that D.R. told him petitioner grabbed his sister and started pulling her toward his truck but didn't know how far he dragged her, and D.R.'s testimony at trial that petitioner actually pulled his sister into the middle seat of his truck.  (ECF No. 13 (Traverse) at 9; Clerk's Transcript (CT) at 24, 29-30; RT at 29-30.)  Petitioner also notes that Officer Bullington testified at the preliminary hearing that the incident occurred less than 50 feet from petitioner's truck, but at trial D.R. testified that petitioner grabbed his sister within a couple of feet from the truck and then pulled her into his truck. (Traverse at 9; CT at 29; RT at 88.)  Other discrepancies in D.R.'s accounts identified by petitioner are the following:  (1) D.R. told Officer Bullington that petitioner approached him and J.R. in the parking lot, but testified at trial that petitioner grabbed J.R. from "up in the truck;"  (2) D.R. told Bullington that he saw petitioner's exposed penis when petitioner grabbed J.R., but testified at trial that he did not see it;[11] (3) D.R. told Bullington that he, J.R. and Kyler were together on the second floor of the apartment building when petitioner confronted them but testified at trial that he and J.R. were on the stairs and Kyler was above them, at the top of the stairs; and (4) D.R. told Bullington that petitioner confronted them in a hallway and that they had

/////

_____

[10]  The page from the state court record that contains trial counsel's cross-examination of D.R. is missing from the record provided by respondent to this court.  However, the absence of this page from the record has no impact on these findings and recommendations.  Respondent does not dispute that petitioner's trial counsel failed to cross-examine D.R. about the alleged discrepancies between his statements to Officer Bullington and his trial testimony.

[11]  D.R. did testify that he saw petitioner's "privates" when he and his sister were walking down the stairs after petitioner confronted them.  (RT at 82.)

1  to go around him to get downstairs, but testified at trial that after petitioner confronted him he

2  just walked downstairs.  (Pet. at 24-25; RT at 77, 80.)

3         Petitioner argues that it was critical to impeach D.R. because petitioner's defense

4  was that "D.R. lied and made up an incident that never happened."  (Pet. at 22.)  Petitioner

5  contends that "D.R. was the main witness, and undermining his credibility should have been one

6  of [counsel's] key goals."  (Id. at 25.)  He argues that there is no reasonable strategic explanation

7  for trial counsel's failure to effectively impeach D.R.'s trial testimony.  (Id.; Traverse at 10.)

8         The California Court of Appeal rejected these arguments on appeal, reasoning as

9  follows:

10  Defendant further contends that he received ineffective assistance

11  of counsel based on his trial counsel's abbreviated cross-examination of D.R. and failure to impeach D.R. concerning

12  discrepancies between his trial testimony and his statements to one of the responding police officers.

13  The defendant bears the burden of proving ineffective assistance of

14  counsel and, to succeed on such a claim, must establish both deficient performance and resulting prejudice.  (People v. Maury

15  (2003) 30 Cal.4th 342, 389.)  "A court must indulge a strong presumption that counsel's conduct falls within the wide range of

16  reasonable professional assistance. [Citation.]  Tactical errors are generally not deemed reversible, and counsel's decisionmaking

17  must be evaluated in the context of the available facts. [Citation.]" (Ibid.)  Generally, cross-examination and impeachment are matters

18  of trial tactics and strategy.  (Gustave v. United States (9th Cir.1980) 627 F.2d 901, 905.)

19  "To the extent the record on appeal fails to disclose why counsel

20  acted or failed to act in the manner challenged, we will affirm the judgment unless counsel was asked for an explanation and failed to

21  provide one, or unless there simply could be no satisfactory explanation. [Citation.]  Moreover, prejudice must be

22  affirmatively proved; the record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result

23  of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in

24  the outcome.' [Citation.]"  (People v. Maury, supra, 30 Cal.4th at p. 389.)

25  Defendant points out that at the preliminary hearing, Sergeant

26  Bullington said D.R. told him that D.R., Kyler, and J.R. were together on the second floor when defendant confronted them.

27

However, D.R. testified at trial that he and J.R. were on the stairs and Kyler was above them on the walkway in front of the apartments when the confrontation occurred.  Sergeant Bullington also testified that D.R. said defendant approached him and J.R. in the parking lot, that defendant's penis was exposed when he grabbed J.R., and that defendant pulled her toward the pickup truck which was less than 50 feet away.  At trial, however, D.R. said defendant was inside the truck when he grabbed J.R. and D.R. did not see if defendant's penis was exposed.  Defendant asserts that trial counsel "should have been salivating waiting to impeach [D.R.]," but he barely cross-examined him.

Defense counsel's decision not to extensively cross-examine D.R. was a rational tactical choice.  The disparity between D.R.'s statements to Bullington and his trial testimony was not so great that D.R. could not have provided a logical explanation.  D.R. consistently stated that defendant threatened him and his sister at the apartment complex, that defendant exposed himself, and that defendant called out to J.R. as they were leaving.  At trial D.R. said that Kyler and defendant were on the first floor above the carport while he and J.R. were on the stairs.  But because the first floor of apartments was above the carport, it is possible that Sergeant Bullington referred to the first floor above the carport as the second floor, and indicated that they all were on the first floor when, in fact, D.R. and J.R. were trying to join Kyler on the first floor.  It is also possible that D.R. did not give Bullington a precise statement during the excitement following defendant's attempted kidnap of D.R.'s three-year-old sister.  Cross-examining D.R. regarding this minor discrepancy was not likely to tarnish his credibility and establish a reasonable doubt in the minds of the jurors given that D.R. consistently testified concerning the primary facts.

As for the attempted kidnapping in the parking lot, D.R. testified defendant got out of the truck and dragged J.R. a few feet into the truck, which does not necessarily conflict with the officer's testimony that defendant dragged J.R. to his truck less than 50 feet away.  Moreover, there is no clear indication whether Bullington was estimating the distance when he testified or whether D.R. told the officer the truck was less than 50 feet away.

Defendant seizes on the alleged disparity between D.R.'s statement and testimony regarding whether or not defendant's penis was exposed when he grabbed J.R., but fails to explain how it would have been helpful to cross-examine D.R. on this matter.  Bullington testified that D.R. said defendant's penis was exposed.  D.R. testified he did not see if his penis was exposed "[b]ut my sister says it was."  The prosecutor admonished D.R. to only talk about what he saw.  If defense counsel had cross-examined D.R. about the alleged discrepancy, D.R. would be able to explain and emphasize that the police statement was based upon what his sister stated that she saw.  Not only would the witness be rehabilitated,

> the damaging fact would be emphasized.  Thus, trial counsel was
> not deficient for declining to follow up on this point.
>
> Defendant has not established that he received ineffective
> assistance of counsel.

(Opinion at 46-49.)

To support a claim of ineffective assistance of counsel, a petitioner must first show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  Strickland v. Washington, 466 U.S. 668, 687-88 (1984).  After a petitioner identifies the acts or omissions that are alleged not to have been the result of reasonable professional judgment, the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.  Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).  "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'"  Richter, 131 S. Ct. at 787-88 (quoting Strickland, 466 U.S. at 687).  Surmounting the bar imposed by Strickland was "never an easy task," and "establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult."  Id. at 788.  "When § 2254(d) applies, the question is not whether counsel's actions were reasonable . . . [but] whether there is any reasonable argument that counsel satisfied Strickland's deferential standard."  Premo v. Moore, ___ U.S. ___, ___, 131 S. Ct. 733, 740 (2011).

Second, a petitioner must establish that he was prejudiced by counsel's deficient performance.  Strickland, 466 U.S. at 693-94.  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.  "The likelihood of a different result must be substantial, not just conceivable."  Richter, 131 S. Ct. at 792.  See also Gulbrandson v. Ryan, 711 F.3d 1026, 1037 (9th Cir. 2013).

/////

1          The California Court of Appeal determined, in essence, that the failure of

2    petitioner's trial counsel to impeach D.R. with the inconsistencies between what D.R. allegedly

3    told Officer Bullington about the events in question at the scene, as related by Officer Bullington

4    at petitioner's preliminary hearing, and D.R.'s trial testimony with respect to those events, was a

5    reasonable tactical choice.  That determination by the state appellate court is not objectively

6    unreasonable.  Trial counsel could have reasonably concluded that the inconsistencies between

7    Officer Bullington's testimony as to what D.R. told him at the scene, and D.R.'s testimony

8    regarding those events at trial were not material and could have been explained away as incorrect

9    paraphrasing by Officer Bullington or imprecise statements made by D.R. in the excitement of

10   the moment.  See Strickland, 466 U.S. at 690 (reasonable tactical decisions, including decisions

11   with regard to the presentation of the case, are "virtually unchallengeable").  As noted by the

12   California Court of Appeal, the discrepancies pointed out by petitioner are not particularly

13   significant given the fact that D.R. consistently testified to facts that were sufficient to support

14   the charges against petitioner, such as "that [petitioner] threatened [D.R.] and his sister at the

15   apartment complex," "that [petitioner] exposed himself," that [petitioner] called out to J.R. as

16   they were leaving," and that petitioner grabbed J.R. and dragged or pulled her toward his truck.

17   (Opinion at 48.)  In light of the fact that D.R. did not waver or retreat from the critical facts

18   supporting the charged offenses, trial counsel's failure to cross-examine D.R. on discrepancies in

19   the details of his narration does not undermine confidence in the jury's verdict.

20          Nor was it unreasonable for the state appellate court to conclude that petitioner's

21   trial counsel had a rational tactical reason for not exploring whether petitioner's penis was seen

22   by D.R. and J.R., or just by J.R.  As stated by that court, "not only would the witness be

23   rehabilitated, the damaging fact would be emphasized."  (Id. at 49.)  This court also notes that

24   clarifying whether petitioner accosted D.R. and J.R. within fifty feet or three feet of his truck,

25   whether petitioner exposed himself to D.R. and J.R. or just J.R., or where exactly D.R. and Kyler

26   were standing when petitioner confronted them would not have supported petitioner's defense

1  theory that the events did not happen at all.  D.R. never wavered from the essentials of the

2  charged crimes and there was no evidence suggesting that he fabricated the incident.

3          The decision of the California Court of Appeal rejecting petitioner's argument

4  that he received ineffective assistance of counsel is not contrary to or an unreasonable application

5  of the Strickland standard.  Accordingly, petitioner is not entitled to federal habeas relief with

6  respect to this claim.

7                                     CONCLUSION

8          For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

9  application for a writ of habeas corpus be denied.

10          These findings and recommendations are submitted to the United States District

11  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

12  days after being served with these findings and recommendations, any party may file written

13  objections with the court and serve a copy on all parties.  Such a document should be captioned

14  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

15  shall be served and filed within fourteen days after service of the objections.  Failure to file

16  objections within the specified time may waive the right to appeal the District Court's order.

17  Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir.

18  1991).  In his objections petitioner may address whether a certificate of appealability should issue

19  in the event he files an appeal of the judgment in this case.  See Rule 11, Federal Rules

20  Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability

21  when it enters a final order adverse to the applicant).

22  DATED: July 17, 2013.

23

24                                     _____

25  DAD:8:                             DALE A. DROZD
    zamora1922.hc                      UNITED STATES MAGISTRATE JUDGE

26